# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSHUA SMITH,<br>    *Plaintiff,*<br><br>    v.<br><br>PEREZ, ET AL.<br>        *Defendants.* | No. 3:19-cv-1758 (VAB) |

## RULING AND ORDER ON RENEWED MOTION FOR SUMMARY JUDGMENT

On November 7, 2019, Joshua Smith ("Plaintiff"), an inmate who is currently housed at

Cheshire Correctional Institution ("Cheshire") under the custody of the Department of

Correction ("DOC"),[1] filed this civil rights Complaint under 42 U.S.C. § 1983 against Captain

Perez, Lieutenant Perez, Lieutenant Ramos, Counselor Supervisor Long, Correction Officer

West, Captain Colon, Correction Officer Musa, Correction Officer West, Deputy Warden

Snyder, Osborn Warden Gary Wright, and Commissioner Scott Semple, in their official and

individual capacities. Compl., ECF No. 1 (Nov. 7, 2019) ("Compl.").

On initial review, the Court determined that Mr. Smith's case should proceed on his First

Amendment Retaliation claim against Captain Perez[2] in his individual capacity for damages.

Initial Review Order at 17, ECF No. 9 (May 8, 2020) ("IRO"). The Court also permitted Mr.

Smith to proceed on his request for injunctive relief against Defendants Cook and Rodriguez in

---

[1] The Court takes judicial notice of the information on the publicly available Connecticut DOC website. *See Inmate Information*, State of Conn. Dep't of Corrs.,
http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=223489 (last visited July 12, 2023); *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (stating that the Court may "take judicial notice of relevant matters of public record").

[2] Mr. Smith initially named Counselor Supervisor Long as a Defendant in this case. Mr. Smith, however, filed a notice of Voluntary Dismissal asking the Court to dismiss Counselor Supervisor Long from the case, which the Court granted. *See* Order, ECF No. 53 (Feb. 4, 2022).

their official capacities. *Id.* at 11. Defendants filed a motion to dismiss, *see* Def.'s Mot. to

Dismiss, ECF No. 43 (Apr. 2, 2021) ("Mot. to Dismiss"), which the Court granted in part and

denied in part, *see* Order, ECF No. 50. As result of the Court's Order on the motion to dismiss,

and Mr. Smith's voluntary dismissal of certain defendants in this case, *see* Notice of Voluntary

Dismissal, ECF No. 52, there are only three remaining defendants in this case: Captain Perez,

Commissioner Rollin Cook, and Warden Nick Rodriguez (collectively, "Defendants").

Defendants filed a motion for summary judgment, arguing that Mr. Smith failed to

comply with the Prison Litigation Reform Act ("PLRA") and cannot establish the requisite

element of his retaliation claim against Captain Perez. *See* Defs.' Mot. for Summ. J., ECF No. 62

(June 29, 2022) ("Mot."); Mem. in Supp. of Mot. for Summ. J., ECF No. 62-1 (June 29, 2022)

("Mem."). Mr. Smith filed an opposition. *See* Pl.'s Opp'n to Defs.'s Mot., ECF No. 87 (Mar. 21,

2023) ("Opp'n"). The Court denied Defendants' motion for summary judgment on March 31,

2023. *See Smith v. Perez*, No. 3:19-CV-1758 (VAB), 2023 WL 2742700, at *1 (D. Conn. Mar.

31, 2023) ("Initial MSJ Order").

Because the Court issued its ruling before Defendants had an opportunity to file a reply

brief, the Court permitted Defendants to renew their motion for summary judgment in

conjunction with any motions *in limine* to be filed in preparation for trial. Specifically, the Court

stated:

> Ordinarily, a motion for summary judgment would be either granted or denied. In
> this instance, however, given the age of this case and the considerable time that has
> lapsed between the original filing of this motion and a response—time permitted
> by this Court—the most expeditious way to move this case forward is to address
> this motion as soon as possible without waiting for a reply brief from the
> Defendants, while giving the Defendants another opportunity to address any issues
> raised here to be renewed at a later time, if they believe the circumstances warrant
> it.

*Id.* at *1 n.3.

2

The Defendants have now renewed their motion for summary judgment, *see* Defs.'
Renewed Mot. for Summ. J., ECF No. 99 ("Renewed MSJ"), and Mr. Smith has filed an
objection, *see* Pl.'s Opp'n to Defs.' Renewed MSJ, ECF No. 104 ("Renewed Opp'n").

For the reasons that follow, Defendants' renewed motion for summary judgment is
**GRANTED** in part and **DENIED** in part.

More specifically, Defendants' renewed motion for summary judgment as to Mr. Smith's
First Amendment Retaliation claim is **DENIED**.

Defendants' renewed motion for summary judgment as to Mr. Smith's request for
injunctive relief with respect to his single cell status and job at Osborn, is **GRANTED** but, to the
extent Mr. Smith is claiming the availability of some other form of injunctive relief not
dependent on his presence at Osborn, it is **DENIED** without prejudice.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Court assumes familiarity with the factual and procedural history of the case and
includes only facts relevant to this Ruling. *See* Initial MSJ Order at *2–5.

Mr. Smith is a sentenced prisoner who was housed at Osborn at the time the alleged
constitutional violations occurred. Ex. A to Pl.'s Opp'n to Defs.' Mot. for Summ. J. ¶ 7, ECF No.
87-1 ("Smith Aff."); Defs.' Local Rule 56(a)(1) Statement of Material Fact ¶ 6, ECF No. 62-1
("Defs.' SMF"). Until around November 30, 2018, Mr. Smith was employed as a Chapel Janitor.
Smith Aff. ¶ 10. For seven years prior to the November 16, 2018, Mr. Smith had no violations of
any Direct Orders from prison officials. *Id.* ¶ 8.

Captain Perez currently serves as a Deputy Warden at the Brooklyn Correctional
Institution. Ex. H to Defs.' Mot. ¶ 2, ECF No. 62-11 ("Perez Decl."). In 2018 and 2019, Captain
Perez held the position of Captain at Osborn. *Id.* ¶ 3.

On November 15, 2018, while Mr. Smith was at his job placement, Captain Perez called Mr. Smith's manager and ask that Mr. Smith return to his unit. Smith Aff. ¶ 10. Captain Perez directed Officer Rivera, *id.* ¶ 10, to cite Mr. Smith with a Class B infraction for possession of a digital television antenna, *id.* ¶ 11; Ex. C to Opp'n at 10, ECF No. 87-1 ("Pl.'s Ex. C").[3]

As of November 15, 2018, Mr. Smith was the first inmate to be charged with a Class B infraction for placing a digital television antenna outside his cell window. *Id.* ¶ 13. Inmates convicted of a Class B Disciplinary Report lose their single cell housing status and job assignments. Ex. D to Opp'n at 13, ECF No. 87-1, ("Smith Advisory Rep.").

## II.   STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

---

[3] Digital television antennas are approved electronic devices which inmates can order using the Connecticut Department of Correction Electronic Order Form. *See* Ex. B to Opp'n at 8, ECF No. 87-1 ("Smith Purchase Order"). Mr. Smith placed an order for the television antenna and a coaxial cable on June 8, 2018, which prison officials approved on June 11, 2018. *Id.*

1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013)

(citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.    DISCUSSION

In their renewed motion for summary judgment, Defendants argue that they are entitled to summary judgment because Mr. Smith (1) failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"); and (2) failed to establish the requisite elements of the retaliation claim against Captain Perez. In the alternative—and for the first time—they argue that Captain Perez is entitled to qualified immunity. As to the injunctive relief claim, Defendants argue that Mr. Smith's request—single cell status and being allowed to return to his employment—is unrelated to his First Amendment claim, is moot and is barred by the Eleventh Amendment.

Before turning to the substance of Defendants' renewed motion for summary judgment, the Court will first address the scope of its Initial MSJ Order permitting Defendants to file this renewed motion. In that Order, the Court provided Defendants an opportunity to address the issues that the Court raised in its Order. *See* Initial MSJ Order at *1 n.3 ("giving the Defendants another opportunity to address any issues raised" in the Order). In other words, the Court simply permitted Defendants to respond to "issues raised" in the Order, not to raise new arguments. *Id.*

As a result, consistent with the plain reading of the footnote three of the Initial MSJ Order, the Court will not entertain new arguments not previously raised by Defendants in their initial submission, including arguments related to qualified immunity. The Court will instead consider Defendants' submission under the same standard that it would consider a Reply. *See*

*Cuba-Diaz v. Town of Windham*, 274 F. Supp. 2d 221, 230 n.8 (D. Conn. 2003) ("[A reply brief] must be strictly confined to a discussion of matters raised by the responsive brief . . . .") (quoting D. Conn. L. Civ. R. 7(d)); *Corpes v. Walsh Constr. Co.*, 130 F. Supp. 3d 638, 644 (D. Conn. 2015) ("Because raising new arguments for the first time in a reply brief is improper, the Court will not consider these issues." (citations omitted)).

With this background, the Court will now turn to Defendants' renewed motion for summary judgment as to Mr. Smith's First Amendment claim and Mr. Smith's Injunctive Relief claim.

### A.  The Court's Initial Order on Defendants' Motion for Summary Judgment as to the First Amendment Retaliation Claim

It is well settled that when deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). As the non-movant in this case, Mr. Smith is entitled to have the evidence in the entire record construed in the light most favorable to him and to have all reasonable inferences drawn in his favor. Moreover, the Court's review is not limited to the four corners of the parties' submission in connection with the motion for summary judgment. The Court may instead review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007).

Defendants principally argue that the Court "misconstrued" their "exhaustion argument," "the factual basis and scope" of Mr. Smith's retaliation claim as permitted by the IRO and "overlooked or misapplied Second Circuit and Supreme Court caselaw on the issue of

exhaustion." Renewed MSJ at 2.

A review of their renewed motion, however, reveals that the Court's summary of their argument in the initial order is largely consistent with Defendants renewed articulation of their arguments. *Compare* Initial MSJ order at *7 ("In Defendants' view, although Mr. Smith filed four grievances between December 2018 and January 2019, none of these grievances are adequate to satisfy Mr. Smith's exhaustion requirement under the PLRA."), *with* Renewed MSJ at 11 (explaining that Defendants' exhaustion argument "was, and still is, that the PLRA requires that the plaintiff *properly* exhaust his remedies as to the conduct or complaints that now give rise to his First Amendment retaliation claim"); and *id.* at 12 (explaining that "the two grievances that the plaintiff claims exhaust his retaliation claim, Grievance #115-19-125 and Grievance #115-19-168, are insufficient to satisfy the PLRA's exhaustion requirement, as they either failed to place prison officials on sufficient notice of the complaints that now form the basis of his retaliation claim and/or were not properly exhausted").[4] Thus, the Court did not misconstrue their exhaustion argument.

Defendants instead appear to disagree with the Court's analysis and interpretation of federal case law related to exhaustion under the PLRA. In their view, Mr. Smith's grievances did not provide sufficient notice to prison officials, as required by the Second Circuit, that Captain

---

[4] The Court's full summary of Defendants' arguments in the initial MSJ Order is as follows:

> In Defendants' view, although Mr. Smith filed four grievances between December 2018 and January 2019, none of these grievances are adequate to satisfy Mr. Smith's exhaustion requirement under the PLRA. *See* Mem. at 14, 16, 21. In particular, Defendants argue that Mr. Smith's Dec. 2018 Grievance failed to "raise any complaint concerning captain Perez or any retaliatory actions taking by him," *id.* at 10, while his January 27, 2019 Grievance—which does raise Captain Perez's alleged retaliation—was "not timely filed in accordance with AD 9.6," *id.* at 12. Therefore, according to Defendants, Mr. Smith's First Amendment Retaliation claim is barred the PLRA. *Id.* at 22.

Initial MSJ Order at *7 (footnote omitted).

Perez retaliated against him. *See e.g.*, Renewed MSJ at 18 (explaining that Mr. Smith's December 2018 Grievance was insufficient because in that grievance, Mr. Smith stated that he was "grieve[ing] the *due process* procedure of a class infraction for housing rule violations") (quoting Mr. Smith's December 11, 2018 Grievance); *id.* at 22 (arguing that although the January 27, 2019 grievance "raised complaints concerning Captain Perez retaliating against him, including mentioning Captain Perez labeling him as a 'snitch' and placing his safety at risk," this Grievance cannot exhaust Mr. Smith's retaliation claim because it was not timely filed). But the Court explained in its initial MSJ ruling that Mr. Smith did in fact exhaust his administrative remedy in his December 11, 2018 Grievance and to the extent that this Grievance failed to put Defendants on notice, his supplemental January 27, 2019 Grievance cured any defects. *See* Initial MSJ Order at 15–17. The Court further noted that, in the alternative, Defendants' "'machination' . . . of the administrative remedy procedure" effectively rendered the administrative procedure unavailable to Mr. Smith. *Id.* at 17 (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Court then concluded it "will reject Defendants' attempt of 'machination' of the administrative remedy procedures." *Id.*

Nevertheless, because the Court invited Defendants to renew their motion for summary judgment in lieu of a reply, the Court will reevaluate Defendants' exhaustion arguments as well as their merits argument. Before turning the Defendants' arguments, the Court will (1) reiterate Second Circuit and Supreme Court caselaw on the issue of exhaustion; (2) summarize the Connecticut Department of Corrections' grievance procedures; (3) review Mr. Smith's exhaustion efforts; and (4) review Defendants undisputed statements of material facts with respect to Mr. Smith's exhaustion efforts.

### 1.   The PLRA's Exhaustion Requirement

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal

lawsuit to exhaust available administrative remedies before a court may hear his case. *See* 42

U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to

prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any

jail, prison, or other correctional facility until such administrative remedies as are available are

exhausted"); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion

requirement applies to all inmate suits about prison life.").

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making

informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also

Day v. Chaplin*, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming grant of

summary judgment for failure to exhaust administrative remedies and stating that informal letters

sent to prison officials "do not conform to the proper administrative remedy procedures");

*Timmons v. Schriro*, No. 14-CV-6606 (RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015)

("The law is well-settled that informal means of communicating and pursuing a grievance, even

with senior prison officials, are not sufficient under the PLRA.").

The PLRA requires "proper exhaustion"; the inmate must use all steps required by the

administrative review process applicable to the institution in which he is confined and do so

properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88

(2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (stating that exhaustion

necessitates "using all steps that the [government] agency holds out, and doing so properly").

"Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*,

655 F.3d at 96; *see also Jones*, 549 U.S. at 211 ("There is no question that exhaustion is

mandatory under the PLRA and that unexhausted claims cannot be brought in court."). The

Supreme Court has held that the requirement for proper exhaustion is not met when a grievance

is not filed in accordance with the deadlines established by the administrative remedy policy.

*Jones*, 549 U.S. at 217–18 (citing *Woodford*, 548 U.S. at 93–95).

Exhaustion of administrative remedies must be completed "before [the inmate] fil[es]

suit." *Baez v. Kahanowicz*, 278 F. App'x 27, 29 (2d Cir. 2008) (summary order). Completing the

exhaustion process after the complaint is filed does not satisfy the exhaustion requirement. *Neal*

*v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001) ("[A]llowing prisoner suits to proceed, so long as

the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to

pursue administrative remedies prior to filing a complaint in federal court.").

An inmate's failure to exhaust administrative remedies, however, is excusable if the

remedies are, in fact, not "available." *Ross v. Blake*, 578 U.S. 632, 642 (2016) ("An inmate . . .

must exhaust available remedies, but need not exhaust unavailable ones."). The Supreme Court

has determined that "availability" in this context means that "an inmate is required to exhaust

those, but only those, grievance procedures that are capable of use to obtain some relief for the

action complained of." *Id.* (internal quotation marks and citations omitted). In *Ross*, the Supreme

Court identified three circumstances in which a court may find that internal administrative

remedies are not available to prisoners under the PLRA. *Id.* at 643–44. First, "an administrative

procedure is unavailable when (despite what regulations or guidance materials may promise) it

operates as a simple dead end—with officers unable or consistently unwilling to provide any

relief to aggrieved inmates." *Id.* at 643. "Next, an administrative scheme might be so opaque that

it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not

"available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

The Second Circuit has noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016). In considering the issue of availability, however, the Court is guided by these illustrations. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) ("While not exhaustive," the three circumstances described in *Ross* "nonetheless guide the Court's [exhaustion] inquiry." (citation omitted)).

Exhaustion of administrative remedies is an affirmative defense. Thus, the defendants bear the burden of proof. *See Jones*, 549 U.S. at 216. Once the defendants establish that administrative remedies were not exhausted before the inmate commenced the action, the plaintiff must establish that administrative remedy procedures were not available to him under *Ross*, or present evidence showing that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendants' assertion by showing exhaustion [or] unavailability[.]").

## 2.   The Connecticut Department of Correction's Grievance Procedure

The general inmate grievance procedure applicable in this case is set forth in Administrative Directive 9.6. *See* Ex. F to Defs.' Mot. for Summ. J., ECF No. 62-9 (June 29, 2022) ("Dir. 9.6"). Dir. 9.6(1) states "[t]he Department of Correction shall provide a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority."

Under Dir. 9.6, an inmate must first attempt to resolve the matter informally. Dir. 9.6(6)(A). The inmate may attempt to verbally resolve the issue with an appropriate staff member or supervisor. *Id.* If attempts to resolve the matter verbally are not effective, the inmate must make a written attempt using an Inmate Request Form and send the form to the appropriate staff member or supervisor. *Id.* If an inmate does not receive a response to the written request within fifteen business days, or the inmate is not satisfied with the response to his request, the inmate may file a Level 1 grievance. Dir. 9.6(6)(C) & (I).

The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *Id.* The Unit Administrator shall respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance. Dir. 9.6(6)(I). The Unit Administrator may extend the response time by up to fifteen business days upon notice to the inmate on the prescribed form. Dir. 9.6(6)(J).

The inmate may appeal the disposition of the Level 1 grievance by the Unit Administrator, or the Unit Administrator's failure to dispose of the grievance in a timely manner, to Level 2. Dir. 9.6(6)(G), (I) & (K). The Level 2 appeal of a disposition of a Level 1 grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level 1 grievance. Dir. 9.6(6)(K). An appeal of a Unit Administrator's failure to dispose of the Level 1 grievance in a timely manner must be filed within sixty-five days from the date the Level 1 grievance was filed by the inmate. Dir. 9.6(6)(M). Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or Level 2 appeals to which there has been an untimely response by the District Administrator. Dir. 9.6(6)(L).

13

### 3. Mr. Smith's Exhaustion Efforts

Mr. Smith received his Class B infraction on November 15, 2018. Smith Aff. ¶ 11. On

November 26, 2018, Mr. Smith completed a disciplinary report related to this infraction.[5] In that

report, Mr. Smith stated:

> I was never told by any staff in H-Block not to have an antenna
> outside of my window. On 11-15-18, I was called from my job,
> Facility Chapel, by captain Perez. Upon my arrival in the unit
> Captain Perez asked me if I had an antenna in my cell window. I told
> Captain Perez that I did have one and he told me to go retrieve it.
> After which I was given a Class B D.R. for disobeying A Direct
> Order. I will honestly say that as a prisoner whose been incarcerated
> for over 24 years, I would not jeopardize my job, housing over not
> complying with an officer's order. In this matter I am requesting for
> progressive discipline in this issue. My last D.R. was seven years
> ago. There are no published unit rules in regard to this matter. This
> is a violation of unit rules and I ask for it to be treated as such.

Ex. D to Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 12,[6] ECF No. 87-1. On November 27, 2018,

a DOC official assigned to resolve the Class B infraction conducted a hearing. Ex. C to Smith

Renewed Opp'n at 46, ECF No. 104 ("Pl.'s Ex. C"). "Based on the description of the violation,"

the hearing officer "substituted the charge from D.A.D.O to V.O.U.R.," *id.*, the former

presumably being violation of a Direct Order and the latter being a violation of unit rule. After

the infraction was reduced to a Class C, Mr. Smith pleaded guilty to the now reduced Class C

violation. *Id.* Mr. Smith allegedly was informed by the hearing officer that he would not lose his

single cell status and his job as a result of a Class C violation. *See* Ex. D to Defs. Renewed MSJ

at 3, ECF No. 99-6 ("Defs.' Ex. D"), *accord* Pl.'s Ex. C at 43 (noting that prisoners convicted of

Class A and B Disciplinary Reports will lose their housing and job assignments). Nevertheless,

---

[5] A review of this report suggests that a disciplinary report is an accused inmate's statement in response to an infraction that the inmate receives.

[6] Unless otherwise noted, page numbers cited in connection with any exhibit refer to the pager numbers generated by ECF, not the document's internal page number.

according to Mr. Smith, he lost his single cell status and his job soon after the hearing. Defs.' Ex.

D at 4.

On November 30, 2019, Mr. Smith wrote to Deputy Warden Snyder about losing his

single cell status and job over the class C violation:

> To Deputy Warden Snyder,
> Good day to you sir. On November 15, 2018, I received an infraction for unit rule violation. (antenna outside cell window). The DHO hearing was conducted on Tuesday November 26, 2018 at which time I was told I wouldn't [lose] my job or housing status for a class C DR.
> However, on Friday November 30, 2018, my job was taken from me, plus my housing status behind a class C DR. Within the past month, between B-Block and H-Block, over 30 inmates received Class C infractions for housing rule violations, including five other inmates that went to the DHO hearing with me on 11-26-18. No one else lost their jobs [and] housing because a class C offense.
> D/W Snyder, I am the only inmate has been subject to impartiality & discriminatory conduct. Can you please look in this matter and fix this injustice. In my 25 years of incarceration, I have never experience[d] this kind of injustice. My last DR was 7 years ago. Thank you in advance

Defs.' Ex. D at 6 ("1st Snyder Letter").

On December 4, 2018, Deputy Snyder responded, stating: "I am going to pass this to my

partner, DW Otero-Negron as she oversees these issues." *Id.*

The next day, on December 5, 2018, Mr. Smith wrote to Deputy Warden Otero-Negron:

> Dear Deputy Warden Otero-Negron,
> I was informed to also address my concerns with your office. I am seeking your professional assistance with my on going issue with Captain Perez and C.S. Long currently abusing their authority taken [sic] my job & housing status behind a class C infraction. However, Page 10 Section D of the facility current hand-book clearly states that an inmate can only lose their jobs and housing status for class A and Class B tickets.
> This isn't a publish rule and I shouldn't be discriminated against. Can you please look into this matter and allow me to obtain my job and housing status back in a timely manner. I've being [sic] DR free for the past 7 years, which isn't a easy task to do in the negative

15

> environment. I honestly believe I am being retaliated against which
> is a blatant violation of Administration Directive 2.17: Staff
> Conduct. For working a 7 day job, I currently receiving between 16
> & 17 days a month good-time/jail credit. I am under the old . . .
> which means that I have a "<u>Civil Liberty Interest</u>" to work 7 day a
> week job. For said reasons and more, I refuse to do any (sic) that
> will jeopardize my opportunity to good standing with the facility.
> As far as I know, I am in good standing with the facility. My job
> was a chapel janitor, my boss <u>Chaplain Rosado</u> has been advocating
> on my behalf to no avail.
> Resolution: For the rules & Procedure of the Osborn CI be respected
> and honor [sic]. And for you and your staff members to not engage
> in retaliatory conduct. Our little rights should be protected. Plus
> allow me to obtain housing status and job back inside the facility
> chapel in a timely manner.
> Thank you in advance.

Ex. E to Pl.'s Opp'n at 15, ECF No. 87-1 ("Pl.'s Ex. C"). The record does not indicate whether

Mr. Smith received a response from Deputy Warden Otero-Negron.

On December 11, 2018, Mr. Smith filed a Level 1 Grievance in which he stated:

> On September 15, 2018, I received a Class B DR for Disobeying a
> Direct Order for having antenna out-side cell window. While
> housing in H-Block, at anytime was I approach or given a direct
> order to removed my antenna. Per Administrative Directive 9.5,
> page 4 of 22, Section 7, state clearly, housing rules shall be posted
> in inmates' housing units and copies shall be placed in inmates
> libraries as appropriate. There are no posted unit rules while housed
> in H-Block. On September 26, 2018, I went to a D.H.O. hearing at
> which time D.H.O Officer Lt. Perez, drop the disobeying direct
> order DR, to unit rule violation Class C (infractions). From said
> hearing I was informed by Lt. Perez, I would not lose my job nor
> housing for a Class C DR. However, on Friday November 30, 2018,
> my job and housing was taken. I would like to bring to your attention
> that housing rule violations should be progressive discipline, which
> was not exercised in this case. There are no administrative directive
> which govern any inmates to lose their jobs and housing behind a
> Class C infraction—housing rule violation. I currently received 17
> days good time jail credit monthly for obtaining a 7 day job which
> was taken behind a Class C (infractions).

Defs.' Ex. D at 4–9 ("December 2018 Grievance"). Mr. Smith enclosed the letter written to

Deputy Warden Snyder on November 30, 2018. *See id.* at 6.

On December 25, 2018, Mr. Smith wrote to then-DOC Commissioner Semple. *See* Ex. E

to Defs. Renewed MSJ at 7–12, ECF No. 99-7 ("Semple Letter"). In that letter, Mr. Smith notes

that he had written to Commissioner Semple before about issues related to "single cell status

which your office fixed in a timely manner." *Id.* at 10. In relevant part, the letter states:

> This is a complaint against captain Perez and C.S. Long, for their
> display of unprofessionalism, discrimination, retaliation, violation
> of DOC policies.
> On Nov 15, 2018 while house in H-Block I had received a Class B
> Offense, for the Disobeying a Direct Order – Housing antenna
> outside cell window. On Nov 26, 2018 myself and five other inmates
> attend the D.H.O hearing together for the same housing rule
> violation infraction. At said hearing, the D.H.O hearing officer L.T.
> Perez, drop all six inmates Class B offense, to class C, housing rule
> violation.
> Before signing said class C, I was told that I wouldn't loose [sic] my
> job & housing by hearing officer L.T. Perez for such offense.
> Mr. Semple, within the past two months, between the two working
> Block, H and B, there has been over 30 inmates with the same
> infractions for housing rules violation – for antennas out cell
> window. However, I was the only inmate who had lost my job &
> housing on November 30, 2018 per unit manager Capt Perez and
> Classification Supervisor C.S. Long etc.
> On December 4, 2018 I wrote Deputy Warder Snyder, (via) Inmate
> Request expressing my concerns about Captain Perez, and C.S.
> Long display of unprofessionalism and discrimination conduct
> against me. As a result of said request, Capt Perez, and C.S. Long,
> in return, move four other inmates with the same infraction that
> attended the DHO hearing with myself on Nov 26, 2018.
> While those inmates were being moved to a none [sic] working
> block they ask unit manager Capt Perez why were they been [sic]
> move. (Capt Perez response was that, thank to inmate Smith
> #223489, over in C-Bloc crying about being the only inmate got
> moved, so to shut him up I have to move you guys too). Because of
> said Comment & Conduct by Captain Perez, I am currently being
> label a "Snitch" which put my life and safety at serious risk. I have
> received several verbal threats from different inmates, including
> gang-member etc. From fear of being victimize, on Dec 13, 2018 I
> end-up in a physical fight with another inmate who was part of the
> problem.
> Since my placement in R.H.U, I have requested for a advisor C/O
> Sterlacci, in preparing for my defense at D.H.O hearing. As my
> advisor Officer Sterlacci, had obtained several statements from

> some of the inmates that was moved and other about the comment
> that Capt Perez, had made about when moving the rest of inmates.
> Captain Perez, currently sabotaging the investigation by
> intimidating C/O Sterlacci, and all the witnesses who gave
> statements against him Capt Perez. Capt Perez, should not be
> included in anyway, with this investigation. He is engaging in
> conduct that constitutes, that gives rise to conflict of interest, which
> should be strictly prohibited. . . .
>
> Resolution: C.S. Long and Captain Perez should be retrain to follow
> D.O.C policy such as Firm, Fair & Consistence, at all time. Also to
> respect the little rights that inmates have. From the display of their
> blatant abuse of authority and reckless behavior then [sic] should he
> held accountable for serious action by been [sic] demoted. As high
> ranking staff, their duty should be exercise with pure Pride & Honor,
> to say the lease [sic]. Not with unprofessionalism and retaliatory
> conduct. . . .

Semple Letter at 7–12. The record does not indicate whether Mr. Smith received a response from

Commissioner Semple's office.

On December 27, 2018, Mr. Smith submitted an inmate Request Form, using form CN

9601, to Deputy Warden Snyder. *See* Defs.' Ex. E to Defs. Renewed MJS at 6–18 ("IRF to

Snyder"). In the IRF to Snyder, Mr. Smith "enclosed a 6 page letter and a copy of [his] advisory

report date 12/17/2018 for [Deputy Warden Snyder's] reviewing about [his] ongoing problem

with [Deputy Warden Snyder's] high raking staff member and their unprofessionalism etc." *Id.*

at 6.

On January 7, 2019, Deputy Warden Snyder responded to Mr. Smith's IRF stating:

> You will be transferred out of Osborn C.I. at the discretion of
> Population Management. I reviewed this situation you referenced in
> your request and admin report and although you were the first one
> moved at no time were you the only one who lost their job. Per
> administrative directive you can lose your job . . . for any and all
> disciplinary infraction. All similarly situated inmate either have or
> will lose their job as a result of that ticket.

*Id.*

On January 27, 2019, Mr. Smith filed a formal grievance using Inmate Administrative Remedy Form CN 9602. *See* Defs. Ex. E at 3–18 ("January 2019 Grievance"). In that grievance, Mr. Smith enclosed various documents including: the IRF to Snyder; Letter to Semple; and an "Advisory Report from C/O Sterlacci from 12-17-2018." *Id.* at 4. As for resolution, Mr. Smith noted that he is "requesting that this matter be handle in a professional manner please. Capt. Perez, serious displayed of reckless disregard for my safety causing me to suffering [sic] severe emotional distress etc." *Id.* at 5.

### 4. Defendants' Undisputed Facts Regarding Mr. Smith's Exhaustion Efforts

Defendants assert that Mr. Smith "was aware, at the absolute latest, on December 17, 2018," of Captain Perez's alleged retaliatory conduct towards him with respect to Captain Perez "labeling him a 'snitch' and identifying him to other inmates as the reason for their change in housing and employment." Ex. A to Defs.' Motion for Summ. J. ¶18, ECF No. 62-2 ("Defs.' SMF"). Therefore, they conclude that Mr. Smith "was required to seek informal resolution and file a Level-1 grievance regarding this complaint within 30 calendar days, or by January 16, 2019." *Id.* ¶ 19.

According to Defendants, Mr. Smith "was aware, at the absolute latest, by December 25, 2018," of Captain Perez' retaliatory conduct towards him with respect to Captain Perez allegedly intimidating his witnesses. *Id.* ¶ 20. Therefore, they conclude, Mr. Smith "was required to seek informal resolution and file a Level-1 grievance regarding this complaint within 30 calendar days, or by January 24, 2019." *Id.* ¶ 21.

To properly exhaust the administrative remedies available to him, according to Defendants, Mr. Smith was required to "first seek informal resolution of his issues, in writing, utilizing an Inmate Request Form, prior to filing a grievance." *Id.* ¶ 12. They further assert that in

the Inmate Request Form, Mr. Smith "'must clearly state the problem and the action requested to remedy the issue' and the appropriate correctional official has 15 business days to respond." *Id.* ¶ 13 (quoting Dir. 9.6(6)(A)). If Mr. Smith is not satisfied with the informal resolution through the Inmate Request Form, or Mr. Smith did not receive a response with 15 business days, they add, he must then "file a Level-1 grievance and attach documentation of his informal resolution attempts, among other requirements." *Id.* ¶¶ 13, 14.

According to Defendants, the Osborn and Garner administrative remedies records from December 2018, January 2019, and February 2019, reveal that Mr. Smith filed four Level-1 grievances during this time. *Id.* ¶ 25. The first grievance, Grievance #115-15-125, was filed on December 11, 2018. *Id.* ¶ 26; *see also* December 2018 Grievance. This grievance was denied on January 7, 2019, and Mr. Smith's appeal of that denial was rejected on March 5, 2019. *Id.* ¶ 28. The Second grievance, Grievance #115-19-146, was filed on January 2, 2019, *id.* ¶ 29, and was ultimately rejected on January 25, 2019, *id.* ¶ 31.[7] The third grievance, Grievance #115-19-159, was filed on January 13, 2019, *id.* ¶ 32, and it was "upheld" on January 27, 2019, *id.* ¶ 35.[8] The fourth grievance, Grievance #115-19-168, was filed on January 27, 2019. *Id.* ¶ 36; *see also* January 2019 Grievance. This grievance "was rejected on March 7, 2019, on the grounds that it was not timely filed in accordance with AD 9.6." *Id.* ¶ 40. Finally, on March 11, 2019, Mr. Smith filed Level-2 appeal of the rejection of the January 27, 2019 Grievance. *Id.* ¶ 41. On April 2, 2019, Mr. Smith's Level-2 appeal "was rejected on the grounds that his Level-1 grievance was

---

[7] This Grievance concerned prison officials alleged failure to respond to Mr. Smith's Freedom of Information Requests.

[8] This Grievance "raised complaints concerning the confiscation of certain footwear by Captain Perez and another correctional officer and stated that it was being done "for retaliation reasons." *Id.* ¶ 33.

not timely filed in accordance with AD 9.6." *Id.* ¶ 42. The rejection also noted that "[a]ppeal to Level 3 will not be answered." Defs.' Ex. E at 19.

With this background, the Court will now address whether Mr. Smith properly exhausted the administrative remedies available to him, or in the alternative, whether Mr. Smith's failure to exhaust is excusable as the remedy was not available to him.

The Court will address each issue in turn.

**B.  The Exhaustion of Available Administrative Remedies**

According to Defendants, Mr. Smith relies on two grievances to show that he satisfied the PLRA's exhaustion requirement with respect to his retaliation claim against Captain Perez. The first grievance, the December 11, 2018 Grievance, Defendants argue, "cannot exhaust [Mr. Smith's] retaliation claim as it fails to reference 'retaliation' and fails to provide any facts suggesting retaliation." Renewed MSJ at 16–17. The second grievance, the January 27, 2019 Grievance, Defendants argue, "cannot exhaust [Mr. Smith's] retaliation claim as it was not timely filed in accordance with AD 9.6 and, therefore, does constitute proper exhaustion under the PLRA." *Id.* at 22.

The Court will address each grievance in turn.

**1.  The December 11, 2018 Grievance**

Defendants do not dispute that the December 2018 Grievance was timely. They instead argue that the December 2018 Grievance "fails to mention Captain Perez, makes absolutely no reference to 'retaliation,'" and most importantly, fails to provide any facts suggesting retaliation, including raising complaints concerning any retaliation actions taken by Captain Perez." *Id.* at 16–17. For these reasons, they concluded that the December 2018 Grievance is inadequate or did not properly exhaust Mr. Smith's claim.

The Court disagrees, in part.

Under Dir. 9.6(6)(A), "[a]n inmate must attempt to seek informal resolution prior to filing an inmate grievance." The inmate may attempt to resolve the issue verbally and if the inmate is unsuccessful, then "the inmate shall submit a written request via CN 9601, Inmate Request Form." *Id.*

Before filing the December 11, 2018 Grievance, Mr. Smith first followed the requirements under Dir. 9.6(6)(A). On November 30, 2018, the same day that Mr. Smith allegedly lost his housing and his job, he wrote a letter to Deputy Warden Snyder stating:

> Good day to you sir. On November 15, 2018, I received an infraction for unit rule violation. (antenna outside cell window). The DHO hearing was conducted on Tuesday November 26, 2018 at which time I was told I wouldn't [lose] my job or housing status for a class C DR.
> However, on Friday November 30, 2018, my job was taken from me, plus my housing status behind a class C DR. Within the past month, between B-Block and H-Block, over 30 inmates received Class C infractions for housing rule violations, including five other inmates that went to the DHO hearing with me on 11-26-18. No one else lost their jobs [and] housing because a class C offense.
> D/W Snyder, I am the only inmate has been subject to impartiality & discriminatory conduct. Can you please look in this matter and fix this injustice. In my 25 years of incarceration, I have never experience[d] this kind of injustice. My last DR was 7 years ago. Thank you in advance.

1st Snyder Letter.

On December 4, 2018, Mr. Smith received a response from Deputy Warder Snyder stating, "I am going to pass this to my partner, DW Otero-Negron as she oversees these issues." *Id.* The next day, on December 5, 2018, Mr. Smith wrote a letter to Deputy Warden Otero-Negron in which he stated, "I was informed to also address my concerns with your office. I am seeking your professional assistance with my on going issue with Captain Perez and C.S. Long currently abusing their authority taken [sic] my job & housing status behind a class C infraction."

Pl.'s Ex. E at 15. As for a resolution, Mr. Smith requested that "the rules & Procedure of the Osborn CI be respected and honor [sic]. And for you and your staff members to not engage in retaliatory conduct. Our little rights should be protected. Plus allow me to obtain housing status and job back inside the facility chapel in a timely manner." *Id.*

Therefore, consistent with the requirements of Dir. 9.6(6)(A), Mr. Smith "attempt[ed] to seek informal resolution prior to filing" his December 2018 Grievance. In his attempt, Mr. Smith specifically mentioned "his ongoing issue with Captain Perez" whom he accuses of "abusing [his] authority" by taking away Mr. Smith's job over a class C infraction. Pl.'s Ex. E at 15. Mr. Smith requested "staff members not to engage in retaliatory conduct," and that he be allowed "to obtain [his] housing status and job back . . . in a timely manner." *Id.* On this record, viewing the evidence in the light most favorable to Mr. Smith and drawing all reasonable inferences in his favor, a reasonable jury could conclude that Mr. Smith satisfied Dir. 9.6(6)(A)'s requirement that he must seek an informal resolution of Captain Perez's alleged retaliation against him before filing a formal grievance. *See* Renewed MSJ at 5–6 (asserting that "AD 9.6's 'Inmate Grievance Procedure' requires an aggrieved inmate to first seek informal resolution of his issues, in writing, through the use of an Inmate Request Form, prior to filing a formal grievance").

Under Dir. 9.6(6)(c) an inmate is required to attach to their Level-1 grievance documentation in connection with the inmate's informal resolution attempts and any responses that the inmate received. *See* Dir. 9.6(6)(C) ("The inmate shall attach CN 9601, Inmate Request Form, containing the appropriate staff member's response, to the CN 9602, Inmate Administrative Remedy Form."). The completed Level-1 Grievance, "along with any relevant documents, shall be deposited in Administrative Remedy Box." *Id.*

Mr. Smith filed his grievance on December 11, 2018. In the first two lines of the

grievance form, Mr. Smith wrote "I am grieving the due process procedure of a class C infraction

for housing rule violation. Inclosed [sic] DW Response." December 2018 Grievance at 4. Mr.

Smith then wrote:

> Facts: On September 15, 2018, I received a Class B DR for
> Disobeying a Direct Order for having antenna out-side cell window.
> While housing in H-Block, at anytime was I approach or given a
> direct order to removed my antenna. Per Administrative Directive
> 9.5, page 4 of 22, Section 7, state clearly, housing rules shall be
> posted in inmates' housing units and copies shall be placed in
> inmates libraries as appropriate. There are no posted unit rules while
> housed in H-Block. On September 26, 2018, I went to a D.H.O.
> hearing at which time D.H.O Officer Lt. Perez, drop the disobeying
> direct order DR, to unit rule violation Class C (infractions). From
> said hearing I was informed by Lt. Perez, I would not lose my job
> nor housing for a Class C DR. However, on Friday November 30,
> 2018, my job and housing was taken. I would like to bring to your
> attention that housing rule violations should be progressive
> discipline, which was not exercised in this case. There are no
> administrative directive which govern any inmates to lose their jobs
> and housing behind a Class C infraction— housing rule violation. I
> currently received 17 days good time jail credit monthly for
> obtaining a 7 day job which was taken behind a Class C
> (infractions).
> Resolution: I am requesting the immediate reinstatement of my job
> and housing status.

December 2018 Grievance. *See also* Renewed MSJ at 6–7.[9] The record also shows that in

addition to the text of the grievance, Mr. Smith did, in fact, enclose his November 30, 2018 letter

to Deputy Warden Snyder and the Warden's response. *See* Defs.' Ex. D at 6.[10]

---

[9] Mr. Smith has argued, and Defendants do not dispute, that "the word 'September' was a scrivener's error as it was meant to be 'November.'" Opp'n at 6.

[10] In his letter to commissioner Semple, Mr. Smith indicated he submitted his letter to Deputy Warden Snyder using "Inmate Request." *See* Semple Letter at 8 ("On December 4, 2018 I wrote Deputy Warder Snyder, (via) Inmate Request expressing my concerns about Captain Perez, and C.S. Long display of unprofessionalism and discrimination conduct against me."). Although Defendants' Exhibit D—which contains Mr. Smith's December 11, 2018 Grievance—includes the letter to Deputy Warden Snyder, that Exhibit does no include inmate Request Form CN 9601. Nonetheless, to the extent that Mr. Smith's December 11, 2018 Grievance did not comply with Dir. 9.6(6)(A) for failure to include CN 9601, Defendants have waived that argument as they did not reject his grievance on that basis and instead adjudicated it on the merits.

In their assessment of the December 2018 Grievance, Defendants do not address the letter to Deputy Warden Snyder that Mr. Smith indicated was enclosed. They instead focus only on the narrative on the actual form and do not mention the enclosed letter. *See* Renewed MSJ at 18 (stating that "rather than raise any complaints against Captain Perez or assert any facts suggesting that Captain Perez was retaliating against him, Grievance #115-19-125 'griev[ed] the due process procedure of a Class C infraction for housing rule violations' and more specifically, the fact that the plaintiff did not disobey any direct order, that there were no 'posted unit rules' in his housing unit, and that 'progressive discipline . . . was not exercised' for his DR"). On this basis, they conclude that the December 2018 Grievance failed to adequately put them on notice regarding Mr. Smith's alleged retaliation claim against Captain Perez.

As an initial matter, consistent with Dir. 9.6(6)(c), Mr. Smith's November 30, 2018 letter is a "relevant document" that was submitted along with his complaint. Indeed, Defendants' own exhibit suggests that the Grievance was accompanied by the letter Mr. Smith indicated was enclosed. *See* Ex. D at 3–6. Therefore, at the very least, Defendants were on notice about Mr. Smith's letter to Deputy Warden Snyder complaining about being "subject to impartiality" as the only one who lost his housing and job over a class C violation and asking that Deputy Snyder "fix this injustice." 1st Snyder Letter. As the Court notes above, after Deputy Warden Snyder responded that he will pass Mr. Smith's letter to Deputy Warden Otero-Negron who "oversees these issues," Mr. Smith followed up with a letter to Deputy Warden Otero-Negron the next day stating: "I was informed to also address my concerns with your office. I am seeking your professional assistance with my on going issue with Captain Perez and C.S. Long currently abusing their authority taken my job & housing status behind a class C infraction." Pl.'s Ex. E at 15. Mr. Smith concluded his letter by requesting that "staff members to not engage in retaliatory

conduct." *Id.* Defendants' submitted records, however, do not show that this letter was also attached to Mr. Smith's December 2018 Grievance. *See* Dir. 9.6(6)(C) (explaining that an inmate "shall attach" the inmate request form which contains documentation of the inmate's informal attempt resolve the issue). Nor did Mr. Smith indicate that he enclosed the Otero-Negron letter. *Cf.* December 2018 Grievance at 4 ("I am grieving the due process procedure of a class C infraction for housing rule violation. Inclosed [sic] DW Response.").

Accordingly, because the December 2018 Grievance did not include Mr. Smith's letter to Otero-Negron identifying Captain Perez and his alleged retaliatory action toward Mr. Smith, this Grievance, on its own, does not properly exhaust Mr. Smith's retaliation claim against Captain Perez.

### 2. The January 27, 2019 Grievance

Defendants next argue that, although Mr. Smith's January 2019 Grievance did "raise[] complaints concerning Captain Perez retaliating against him, including mentioning Captain Perez labeling him as a 'snitch' and placing his safety at risk," this Grievance cannot exhaust his claim because it was not timely filed in accordance with Dir. 9.6. Renewed MSJ at 22. According to Defendants, "there can be no dispute" that Mr. Smith "was aware of Captain Perez's alleged retaliatory conduct set forth in this grievance (*i.e.*, the alleged labeling of him as a 'snitch' and placing his safety at risk), at the absolute latest, by December 17, 2018, when he set forth these complaints in his signed witness statement associated with his disciplinary hearing." *Id.* at 23. Therefore, according to Defendants, under Dir. 9.6, Mr. Smith "was required to seek informal resolution and file a Level-1 grievance regarding this complaint within 30 calendar days, or by January 16, 2019." Defs. SMF ¶ 19. In Defendants view, Mr. Smith failed to meet this requirement and as a result, his January 2019 Grievance was untimely.

The Court disagrees.

As the Court noted above, under Dir. 9.6(6)(A), "[a]n inmate must attempt to seek informal resolution prior to filing an inmate grievance." *See also* Defs,' Here, Defendants concede that Mr. Smith "was required to seek informal resolution and file a Level-1 grievance regarding this complaint within 30 calendar days, or by January 16, 2019." Defs. SMF ¶ 19.

On December 25, 2018, Mr. Smith began his informal resolution attempts as required by Dir. 9.6(6)(A) by writing a letter to Commissioner Semple. In his letter, Mr. Smith noted that he had written to Commissioner Semple before about issues related to "single cell status which [Commissioner Semple's] office fixed in a timely manner." Semple Letter at 10. In this six-page letter, Mr. Smith described in detail his alleged issues with Captain Perez. He began by noting that he received a Class B violation on November 15, 2018, for having an antenna outside his window, which was ultimately reduced to a Class C violation with the promise that he will not lose his job and housing status. *Id.* at 7–8. Next, Mr. Smith stated that despite the fact that there were "over 30 inmates with the same infraction housing rule violations, . . . [he] was the only inmate who had lost [his] job & housing over November 30, 2018 per unit manager Cpt Perez and Classification supervisor C.S. Long." *Id.* at 8. Mr. Smith then outlined his effort to have this issue resolved. He explained that on "December 4, 2018 [he] wrote Deputy Warder Snyder, (via) Inmate Request expressing [his] concerns about Captain Perez, and C.S. Long display of unprofessionalism and discrimination conduct against" him. *Id.* Mr. Smith then stated that "as a result" of his letter Deputy Warden Snyder, "move[d] four other inmates with the same infraction" with whom Mr. Smith attended the DHO hearing on November 26, 2018. *Id.*

Next, Mr. Smith wrote:

> While those inmates were being moved to a none [sic] working block they ask unit manager Capt Perez why were they been move.

27

> (Capt Perez response was that, thank to inmate Smith #223489, over in C-Bloc crying about being the only inmate got moved, so to shut him up I have to move you guys too). Because of said Comment & Conduct by Captain Perez, I am currently being label a Snitch which put my life and safety at serious risk. I have received several verbal threats from different inmates, including gang-member etc. From fear of being victimize, on Dec 13, 2018 I end-up in a physical fight with another inmate who was part of the problem.

*Id.* at 8–9. Mr. Smith then explained that Captain Perez has been "sabotaging the investigation by intimidating . . . all the witnesses who gave statements" in support of his allegation that Captain Perez labeled him a "snitch." *Id.* As for resolution, Mr. Smith requested:

> C.S. Long and Captain Perez should be retrain to follow D.O.C policy such as Firm, Fair & Consistence, at all time. Also to respect the little rights that inmates have. From the display of their blatant abuse of authority and reckless behavior then should he held accountable for serious action by been demoted. As high ranking staff, their duty should be exercise with pure Pride & Honor, to say the lease. Not with unprofessionalism and retaliatory conduct.

*Id.* at 12.

This letter makes clear that, consistent with Dir. 9.6(6)(A), Mr. Smith attempted to seek an informal resolution of his issues. Although Dir. 9.9(6)(6)(A) does not provide an exhaustive list of ways inmate can informally resolve their issue, the rule specifies that the inmate may attempt to resolve the issue verbally. If this effort is not successful, then "the inmate shall submit a written request via CN 9601, Inmate Request Form." *Id.*

Here, in attempt to informally resolve his alleged ongoing issues with Captain Perez, Mr. Smith wrote a letter to the Commissioner and noted that, in the past, the Commissioner's office has been able to resolve his issues in a timely manner. On this record, Mr. Smith therefore met the requirement of attempting to informally resolve his issues.

Under Dir, 9.6(6)(A), if an inmate is not successful at resolving his issues informally, through verbal efforts, then "the inmate shall submit a written request via CN 9601, Inmate

Request Form." *Id.* In that form, "[t]he inmate must clearly state the problem and the action requested to remedy the issue." *Id.*

On December 27, 2018, Mr. Smith submitted a written request using CN 9601, Inmate Request Form as required by Dir. 9.6(6)(A). *See* Defs.' Ex. E at 6. In that written request, Mr. Smith noted "I have enclosed a 6 page letter [Semple Letter] and a copy of my advisor disciplinary report date 12/17/2018, for your reviewing about my ongoing problems with your High-ranking Staff member and their unprofessionalism." *Id.*

This timeline shows that Mr. Smith did, in fact, seek informal resolution on his issues on December 27, 2018, well within the "30 calendar days after the occurrence or discovery of the cause of the grievance." Renewed MSJ at 23. *See also id.* (explaining that Mr. Smith was aware of the Captain Perez's alleged retaliatory conduct—specifically that Captain Perez labeled Mr. Smith a "snitch" and placing his safety at risk—at the absolute latest by December 17, 2018).

Although Mr. Smith timely filed an inmate request form "clearly stat[ing] the problem and the action requested to remedy the issue," Dir. 9.6(6)(A), his obligation under Dir. 9.6 does not end there. Rather, if Mr. Smith "is not satisfied with the informal resolution offered," he must file a formal grievance and "attach CN 9601, Inmate Request Form, containing the appropriate staff member's response, to the CN 9602, Inmate Administrative Remedy Form." Dir. 9.6(6)(C).

On January 7, 2019, Deputy Warden Snyder responded to Mr. Smith's December 27, 2018 Inmate Request Form, which included the six-page letter that Mr. Smith appended to this request. *See* Ex. D at 6. In his response, Deputy Snyder stated:

> You will be transferred out of Osborn C.I. at the discretion of Population Management. I reviewed this situation you referenced in your request and admin report and although you were the first one moved at no time were you the only one who lost their job. Per administrative directive you can lose your job . . . for any and all

> disciplinary infraction. All similarly situated inmate either have or
> will lose their job as a result of that ticket.

*Id.* Although Deputy Snyder signed this response on January 7, 2019, it is unclear whether Mr.

Smith received it on the same day.

On January 27, 2019, Mr. Smith filed his formal Level 1 Grievance. *See id.* at 3–5. As

required by Dir. 9.6(6)(C), Mr. Smith attached the inmate request form along with the

attachments contained in that form. *See id.* at 3–18; *see also* Dir. 9.6(6)(C) ("An inmate may file

a grievance if the inmate is not satisfied with the informal resolution offered. The inmate shall

attach CN 9601, Inmate Request Form, containing the appropriate staff member's response, to

the CN 9602, Inmate Administrative Remedy Form."). In the grievance form, Mr. Smith wrote,

"I am grieving Captain Perez act [sic] of unprofessionalism, discrimination, retaliation, violation

of DOC Policies, and violation of Administrative Directive 2.17 Staff conduct among other

violations." January 2019 Grievance at 4. Critically, Mr. Smith noted "I am enclosing (1)

Request dated 12-27-18 address to  D/W Snyder, (2) 6 page complaint dated 12/25/18 (3)

Advisor Report from C/O Sterlacci from 12-17-2018; (4) Witness statement from Inmate

Thomas Jack #349668, one of the inmates which Captain Perez made his verbal displayed of

reckless disregard for my life and safety etc.[; and] (5) Class A DR, for refusing to live with

another inmate for safety concerns etc." *Id.*

This Grievance was rejected on March 7, 2019, as untimely. *See id.* ("Rejected. Per A.D.

9.6 Section 6 paragraph C. The grievance must be filed within 30 calendar days of the

occurrence or discovery of the cause of the grievance. For that reason this grievance has been

rejected."). Mr. Smith appealed that rejection on March 11, 2019. *See id.* at 19. On April 12,

2019, Mr. Smith's appeal was conclusively rejected. *See id.* ("You are appealing a level 1

grievance regarding staff conduct at Osborn C.I. The response given by Acting Warden Snyder was appropriate.").

A review of the timeline of Mr. Smith's grievance, however, reveals his January 2019 Grievance was timely. Defendants concede that the Inmate Grievance Procedure under Dir. 9.6(6)(A) "requires an aggrieved inmate to first seek informal resolution of his issues, in writing, through the use of an Inmate Request Form, prior to filing a formal grievance." Renewed MSJ at 5–6 (citing AD 9.6 ¶ 6(A)); Defs.' SMF ¶ 12. Defendants further concede that Mr. Smith was required to do so by "January 16, 2019." Defs. SMF ¶ 19. Here, as the Court noted above, Mr. Smith sought an "informal resolution of his issue, in writing, though the use of an Inmate Request Form," Renewed MSJ at 5, on December 27, 2018, twenty calendar days before Defendants stated deadline of January 16, 2019. *See* Ex. E at 6 (showing an CN 9601 Inmate Request Form completed by Mr. Smith on December 27, 2018). Thus, the record is clear that Mr. Smith complied with this requirement.

Although Defendants admit that Mr. Smith was required to "seek informal resolution of his issues, in writing, through the use of an Inmate Request Form, prior to filing a formal Grievance" Renewed MSJ at 5, and they were aware that Mr. Smith did file such a request on December 27, 2018, *see* Defs.' Ex. E at 6, they do not address Mr. Smith's request both in their initial motion for summary judgment and in their renewed motion. They instead focus only on the date Mr. Smith filed his formal Level 1 grievance. *See* Renewed MSJ at 23 ("[Mr. Smith] did not file his Level-1 grievance until January 27, 2019, more than 30 calendar days after the occurrence or discovery of the cause of the grievance.").

Yet, under the plain language of Dir. 9.6(6)(A), and Defendants' own articulation of that rule, *see* Renewed MSJ at 5, Mr. Smith could not file a formal Level 1 Grievance until he filed a

31

CN 9601 Inmate Request Form. *See e.g.*, Dir. 9.6(6)(A) ("An inmate must attempt to seek informal resolution prior to filing an inmate grievance."); Dir. 9.6(6)(C) ("An inmate may file a grievance if the inmate is not satisfied with the informal resolution offered. The inmate shall attach CN 9601, Inmate Request Form, containing the appropriate staff member's response, to the CN 9602, Inmate Administrative Remedy Form."). Thus, under the plain language of Dir. 9.6, Mr. Smith timely submitted his request for informal resolution. At the time Mr. Smith submitted his request for informal resolution on December 27, 2018, twenty calendar days remained under Dir. 9.6's requirement that an inmate files a grievance within thirty calendar days from the inmate's discovery of the cause of the grievance *See* Defs.' SMF ¶ 18 (asserting that Mr. Smith discovered the cause of his grievance on December 17, 2018). And because Mr. Smith filed his Level 1 Grievance on January 27, 2019, twenty calendar days after he received a response to his informal request, the Court concludes that this Level 1 Grievance was likewise timely.[11]

On the record before this Court, viewing the evidence in the light most favorable to Mr. Smith and drawing all reasonable inferences in his favor, a reasonable jury could find that Mr. Smith exhausted his administrative remedies. To the extent that Mr. Smith failed to exhaust his administrative remedies, as the Court will explain, *infra* Part III.C, his failure is excusable.

Accordingly, Defendants' renewed motion for summary judgment on the basis of exhaustion will be denied.

---

[11] Indeed, the tolling of competing deadlines is commonly recognized. *Cf. Oparah v. New York City Dep't of Educ.*, 670 F. App'x 25, 26 (2d Cir. 2016) (summary order) (explaining, for example, "[a] motion for reconsideration filed within 28 days of the judgment tolls the 30-day deadline to appeal" (citing Fed R.  App. P. 4(a)(4)(A)(vi))).

### C.  Whether Any Alleged Failure to Exhaust is Excusable

As the Court noted at the outset, while exhausting administrative remedies is mandatory, a prisoner is only expected to exhaust those remedies that are "available." *Ross*, 578 U.S. at 638–39. The Supreme Court has identified three circumstances in which an administrative remedy is not feasible and thus forecloses the inmate's duty to exhaust: (1) when an administrative remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use;" and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44.

Viewing the evidence in this record in the light most favorable to Mr. Smith and drawing all inferences in his favor, a reasonable jury could find that, to the extent that Mr. Smith failed to exhaust his administrative remedies, his failure is excusable.

As an initial matter, to the extent that Defendants argue that Mr. Smith's thirty-day deadline to file a grievance continued to run regardless of the fact that he filed a timely Inmate Request form as required under Dir. 9.6(6)(A), such a reading is precisely the type of "opaqueness" and "machination" that the Supreme Court has cautioned would render a remedy "unavailable." *Ross*, 578 U.S. at 644; *see id.* (declaring that an administrative remedy is unavailable when "officials . . . devise procedural systems (including the blind alleys and quagmires . . . ) in order to trip up all but the most skillful prisoners" (cleaned up) (citation and internal quotation marks omitted)); *see also Williams v. Corr. Officer Priatno*, 829 F.3d 118, 124 (2d Cir. 2016) (concluding that a prisons' administrative procedures were unavailable where it

was "practically impossible for [an inmate] to ascertain whether and how he could pursue his grievance")

To comport with the requirements of *Ross* therefore, at the very least, Dir. 9.6 must be interpreted to permit tolling an inmate's thirty calendar day requirement after the filing of an inmate request form. Under that interpretation, because Mr. Smith filed his Inmate Request Form on December 27, 2018, ten days after Defendants concede that he discovered the cause of his grievance, *see* Defs. SMF ¶ 18 (explaining that Mr. Smith "was aware, at the absolute latest, by December 17, 2018, of his complaints concerning this alleged retaliatory conduct," meaning Mr. Smith's thirty calendar days began to run on that day), Mr. Smith had twenty days remaining to file his Level 1 grievance. Mr. Smith received a response to his Inmate Request Form from Deputy Warden on January 7, 2019.[12] Exactly twenty calendar days later, on January 27, 2019, Mr. Smith filed his Level 1 Grievance. In other words, assuming that Dir. 9.6 permits tolling, Mr. Smith filed his Level 1 Grievance "within 30 calendar days of the occurrence or discovery of the cause of the grievance." Dir. 9.6(6)(A).

A prohibition against tolling, combined with a lack of notice to inmates indicating that the filing of Inmate Request Form does not toll the thirty calendar day requirement under Dir. 9.6(6)(A) would render Dir. 9.6 "prohibitively opaque." *Thomas v. Aldi*, No. 3:18-CV-1350 (VAB), 2022 WL 16716160, at *11 (D. Conn. Nov. 4, 2022) (explaining that "[a]n administrative grievance scheme can be so opaque that it is unavailable if the relevant sections do not provide a clear answer regarding how to pursue a particular administrative remedy"); *Williams v. Priatno*, 829 F.3d 118, 124–26 (2d Cir. 2016) (holding that the administrative

---

[12] As noted above, although Deputy Warden Snyder signed his response on this date, it is unclear when Mr. Smith, in fact, received the response.

procedures were "prohibitively opaque" in part because the procedures "d[id] not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response"); *Sease v. Frenis*, No. 3:17-cv-770 (SRU), 2021 WL 260398, at *9 (D. Conn. Jan. 25, 2021) ("If the absence of guidance in a grievance procedure can lead to an administrative scheme's being 'prohibitively opaque,' then surely contradictory instructions in a grievance procedure can also lead to an administrative scheme's being prohibitively opaque." (quoting *Priatno*, 829 F.3d at 124–27)).[13]

Leaving aside the opaqueness that Defendants interpretation of Dir. 9.6 creates, on the record before Court, a reasonable jury could find that prison officials "thwart[ed] [Mr. Smith] from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 644.

As to Mr. Smith's December 2018 Grievance, on this record, a reasonable jury could find that the grievance process "operate[d] as a simple dead end—with officers unable or consistently unwilling to provide any relief to [him]." *Ross*, 532 U.S. at 736. In connection with that Grievance, Mr. Smith alleged that he was the first inmate to receive a Class B violation for having a television antenna outside his window. He noted that television antennas were sold in the commissary and that there are no written rules prohibiting an inmate from putting an antenna outside their window. "Based on the description of the violation," the hearing officer "substituted the charge from D.A.D.O to V.O.U.R.," Pl.'s Ex. C at 46, the former presumably being violation of a Direct Order and the latter being a violation of unit rule.

---

[13] Even with tolling, the Court is doubtful that Dir. 9.6 comports with the requirements of *Ross*. Under this interpretation of Dir. 9.6, an inmate is required to balance two filing deadlines and determine how they affect each other. "[S]uch interference with an inmate's pursuit of relief" may render "the administrative process unavailable." *Ross*, 578 U.S. at 632.

Notwithstanding the fact that Mr. Smith allegedly was informed by the hearing officer that he would not lose his single cell status and his job as a result of a Class C violation, *see* Defs.' Ex. D at 3, which he alleged comported with the rules in the place at the time, *see* Pl.'s Ex. D at 13 (noting that prisoners convicted of Class A and B Disciplinary Reports will lose their housing and job assignments), Mr. Smith allegedly was stripped of his single cell status and his job soon after the hearing.

Mr. Smith thereafter sought an informal resolution which ultimately culminated in the December 2018 Grievance, the subject of which, Defendants concede, was the lost housing status and job. *See* Renewed MSJ at 18 ("[The December 2018 Grievance] 'griev[ed] the *due process* procedure of a Class C infraction for housing rule violations' and more specifically, the fact that the plaintiff did not disobey any direct order, that there were no 'posted unit rules' in his housing unit, and that 'progressive discipline . . . was not exercised' for his DR.") (second alternation in original) (citation omitted)).

Although Mr. Smith attached what he alleged were the housing rules in place at the time showing that only class A and B violations resulted in an inmate losing their job, *see* Pl.'s Ex. D at 13, prison officials cited an inapposite rule as the reason for denying this Grievance, *see* Defs.' Ex. D at 4 (denying Mr. Smith's December 2018 Grievance and citing Directive 9.5 which states that an inmate's dismissal from their job for "failure to perform" is a chargeable offence). A reasonable jury could conclude that this explanation constitutes a "misrepresentation" sufficient to mislead an inmate. *See Hackett v. Rodriguez*, No. 3:21-CV-00328 (VLB), 2022 WL 16949369, at *7 (D. Conn. Nov. 15, 2022) (concluding that the Connecticut Department of Corrections' "failure to ensure that [an inmate] received the operative Inmate Handbook not

once, but twice, is functionally equivalent to affirmatively misrepresenting the administrative

remedies," rendering the administrative remedies unavailable under *Ross*).

After Mr. Smith appealed this denial, on March 5, 2019, a prison official conclusively

denied Mr. Smith's December 2018 Grievance stating "[p]ostings within the Osborn housing

units do state that job classification eligibility requires you to be free from Class 'C' DRs within

60 days." Defs.' Ex. D at 10. Yet, on March 2, 2019, three days before prison officials

conclusively denied Mr. Smith's December 2018 Grievance, Deputy Warden Snyder wrote in an

e-mail to Deputy Warden Otero-Negron:

> Captain Acus and I spoke on Friday regarding a grievance filed by
> Joshua Smith cornering his loss of job prior to leaving OCI. He
> recommended that we update the inmate handbook to reflect this
> addition to the job class section as it currently isn't there. This will
> probably be an angle he uses during his grievance process/hearing.
> We're fine in how we addressed him but we might want to look into
> this.

Ex. H to Pl.'s Renewed Opp'n at 33, ECF No. 87-1.

Deputy Warden Otero-Negron responded: "Received, Thank you." *Id.*

On this record, a reasonable jury could find that the administrative remedy "operates as a

simple dead end—with officers unable or consistently unwilling to provide any relief to" Mr.

Smith. *Ross*, 578 U.S. at 643; *see also Carter v. Revine*, No. 3:14-CV-01553 (VLB), 2017 WL

2111594, at *13 (D. Conn. May 15, 2017) ("An administrative remedy is unavailable 'if prison

officials erroneously inform an inmate that the remedy does not exist or inaccurately describe the

steps he needs to take to pursue it.'" (quoting *Angulo v. Nassau Cnty.*, 89 F. Supp. 3d 541, 552

(E.D.N.Y. 2015))); *Small v. Camden Cnty.*, 728 F.3d 265, 271 (3d Cir. 2013) ("Remedies that

are not reasonably communicated to inmates may be considered unavailable for exhaustion

purposes."); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1323 (11th Cir. 2007) (finding it impermissible for "jails and prisons to play hide-and-seek with administrative remedies").

Turning next to Mr. Smith's January 2019 Grievance, on this record, a reasonable jury could likewise find that at every step of the grievance process, "prison administrators thwart[ed] [Mr. Smith] from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, *578 U.S.* at 643–44. First, Mr. Smith alleged that after he filed the December 2018 Grievance—which included a letter to Deputy Warder Snyder complaining about losing his job and housing and being subject to impartial treatment—rather than resolve the issues he complained of, Mr. Smith alleged that prison official began removing other inmates with Class C infractions from their housing and jobs. *See* Defs.' Ex. D at 6.

Viewing this evidence in the light most favorable to Mr. Smith and drawing all reasonable inferences in his favor, a reasonable jury could find that prison official made clear that the remedy he sought—reinstatement of his housing status and job—was unavailable. *See Ross,* 578 U.S. 632 (explaining that "some redress for a wrong is presupposed by the [PLRA's] requirement' of an 'available' remedy . . . . When the facts on the ground demonstrate that no such potential [remedy] exists, the inmate has no obligation to exhaust") (cleaned up) (citation and quotation marks omitted).

Indeed, in response to Mr. Smith's timely filed Inmate Request Form seeking an informal resolution to his "ongoing issues" with Captain Perez, including Captain Perez's alleged retaliation claim against him, Deputy Warden Snyder wrote:

> You will be transferred out of Osborn C.I. at the discretion of Population Management. I reviewed this situation you referenced in your request and admin report and although you were the first one moved at no time were you the only one who lost their job. Per administrative directive you can lose your job . . . for any and all

> disciplinary infraction. All similarly situated inmate either have or
> will lose their job as a result of that ticket.

Defs.' Ex. D at 6. Based on this response, from the deputy warden of the facility in which Mr.

Smith was located and where Captain Perez was employed, a reasonable jury could conclude that

the remedy sought by Mr. Smith was simply unavailable. *See Baltas v. Rivera*, No. 3:19-CV-

1043 (MPS), 2019 WL 3944435, at *10–11 (D. Conn. Aug. 21, 2019) ("If prison officials

'thwart inmates from taking advantage of a grievance process through machination,

misrepresentation, or intimidation' the grievance procedure would be unavailable and the inmate

would be able to proceed to federal court.") (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1859

(2016)); *Ross*, 578 U.S. at 632 ("Under [the PLRA], the exhaustion requirement hinges on the

availability of administrative remedies: An inmate, that is, must exhaust available remedies, but

need not exhaust unavailable ones.").[14]

Finally, Mr. Smith has alleged that Captain Perez "sabotage[d] the investigation by

intimidating . . . all the witnesses who gave statements against him Capt Perez." Semple Letter at

9. Defendants have not responded to this argument. Thus, at the very least, there is genuine issue

of material facts as to whether Captain Perez intimidated Mr. Smith's witnesses.[15]

---

[14] Even if the Court were to accept Defendants' arguments that Mr. Smith "was required to seek informal resolution and file a Level-1 grievance regarding this complaint within thirty calendar days, or by January 24, 2019," Defs. SMF ¶ 21, meaning filing of the Inmate Request Form does not toll the thirty calendar days requirement, Mr. Smith's January 2019 Grievance would be timely as to the requirement that he seeks informal resolution within thirty calendar days. And in light of the response Mr. Smith received from Deputy Warden Snyder—transferring Mr. Smith "out of OCI" and promising that similarly situated inmates will lose their housing and jobs, *see* Defs. Ex. E at 6—at best, he has created a genuine issue of material fact as to whether the remedy he sought was unavailable. This is an alternative basis for rejecting Defendants motion for summary judgment on the basis of exhaustion. *Cf. Gibson v. Brooks*, 335 F. Supp. 2d 325, 333 (D. Conn. 2004) (denying summary judgment where an inmate "pursued the first step required by DOC's grievance procedure," and "created a genuine issue of material fact as to whether he pursued" the next step); *see also id.* at 332 ("Where no further relief is available, a prisoner need not engage in entirely fruitless exercises." (quotation marks and citation omitted).

[15] Mr. Smith submitted one inmate witness statement. In that Statement, inmate Jack Thomas wrote:

> Prior to copping out to the DR, I was told if I copped out to a C I wouldn't lose
> my job, so therefore I copped out to the ticket. A week later they told me I was

In sum, Mr. Smith timely filed an initial grievance on December 11, 2018. While that

grievance was being processed, and because of the letter to Deputy Warden that Mr. Smith

included in connection with that Grievance, according to Mr. Smith, his "on going issues with

Captain Perez" escalated. Semple Letter at 8. According to Mr. Smith, Captain Perez allegedly

labelled him a "snitch" and put his safety at risk. *Id.* In light of these additional developments,

Mr. Smith supplemented his initial grievance by starting the process anew. He sought informal

resolution of his issues with Captain Perez on December 27, 2018, *see* Defs. Ex. E at 6–17, and

thereafter he filed a Level 1 grievance on January 27, 2019, *see id.* at 3–5.

Therefore, on this record, to the extent that Mr. Smith failed to exhaust administrative

remedies before filing his claim, his failure is excusable because the remedy was not available.

Accordingly, the Court will also deny Defendants' renewed motion for summary judgment on

the basis of exhaustion the ground that the administrative remedies were unavailable to Mr.

Smith. *See Gibson*, 335 F. Supp. 2d at 333 (denying summary judgment on basis of exhaustion

where administrative remedies were not available); *Hackett*, 2022 WL 16949369, at *7 (same);

*Carter*, 2017 WL 2111594, at *13 (same).

---

moving, I was confused and addressed the unit Manager Perez and he told me the
reason we were all being moved was because "Smith was making such a stink
about him being moved they had to move us all for it to look fair' he also told me
it was in the handbook. After moving I checked and it wasn't it only said Class
A's & b's causing for job loss and a housing move."

Smith Ex. A at 37. Defendants' Exhibit E also contains two inmate witness statements forms. *See* Defs. Ex. E 14–
15. Those forms, however, were redacted in full. The Court has not been provided an unredacted version of these
statements, nor have Defendants filed motions to seal these statements, articulating "clear and compelling reasons"
why these filings should be kept from the public. *Cf.* D. Conn. L. Civ. R 5(e) ("Every document used by parties
moving for or opposing an adjudication by the Court, other than trial or hearing exhibits, shall be filed with the
Court. No judicial document shall be filed under seal, except upon entry of an order of the Court either acting *sua
sponte* or specifically granting a request to seal that document. Any such order sealing a judicial document shall
include particularized findings demonstrating that sealing is supported by clear and compelling reasons and is
narrowly tailored to serve those reasons."). Defendants therefore are directed to file the unredacted versions of these
inmate witness statements forms on the docket, or to move to have them sealed, justifying any such proposed
sealing. *See Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("[D]istrict courts have the inherent authority to manage their
dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

### D.  Elements of Mr. Smith's First Amendment Retaliation Claim

Defendants also renew their argument that Captain Perez could not have retaliated against Mr. Smith because he was not aware that Mr. Smith had filed a complaint against him. *See* Renewed MSJ at 31. But, as the Court noted in the Initial MSJ Order, a "reasonable jury can justifiably infer [from evidence in the record] that Captain Perez ha[d] retaliatory animus toward Mr. Smith." Initial MSJ Order at 10.

As the party with the burden at summary judgment, Defendants' only evidence that Captain Perez was not aware of Mr. Smith's Complaint against him is Captain Perez' own affidavit so stating. Mr. Smith, however, has countered with his own affidavit indicating otherwise. *See id.* at *10 n.11. More specifically, Mr. Smith states that, "based upon [his] personal knowledge," Smith Aff. ¶ 2, Captain Perez was the "head of [Dispute Resolution]" at the time he filed his complaint against him, *id.* ¶ 15. *See Alvarado v. Ramineni*, No. 9:08-CV-1126 TJM/GHL, 2011 WL 6937477, at *2–3 (N.D.N.Y. Dec. 6, 2011) ("To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit . . . must, among other things, be based 'on personal knowledge.'" (quoting Fed. R. Civ. P. 56(c)(4)")). On the basis of his affidavit, Mr. Smith then argued that a reasonable jury could infer that as the head of Dispute Resolution, Captain Perez was aware of Mr. Smith's complaint against him.

Defendants do not offer evidence to refute Mr. Smith's statement in his affidavit. They instead attack the credibility and sufficiency of the statement in Mr. Smith's affidavit. *See* Renewed MSJ at 31 (asserting "nothing in the plaintiff's affidavit . . . establishes that Captain Perez was aware of any complaints filed against him"). In effect, Defendants asked this Court to credit Captain Perez' affidavit on the basis of his personal knowledge but to disregard Mr. Smith's affidavit that is likewise based on Mr. Smith's personal knowledge. At summary

judgment, such "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 607–08 (2d Cir. 2017) (quotation marks omitted); *Martinez v. Payne*, No. 3:20-CV-00231 (JAM), 2021 WL 3493616, at *1 (D. Conn. Aug. 7, 2021) ("[The Court's] role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial.").

Moreover, as the Court discussed at length, *supra* Part III.B–C, Mr. Smith wrote at least two letters making detailed accusation against Captain Perez, including in a letter to the Commissioner of the DOC and the supervising warden at Osborn CI. Soon after these letters, various inmates were allegedly removed from their housing and jobs. *See* Defs.' Ex. E at 6 (stating, in response to Mr. Smith's complaint against Captain Perez "although you were the first one moved at no time were you the only one who lost their job . . . All similarly situated inmate either have or will lose their job as a result of that ticket"). In light this evidence, a reasonable jury could conclude that Captain Perez was aware of Mr. Smith's complaints against him.

Accordingly, for these reasons and the reasons stated Court's Initial MSJ Order, Defendants' renewed motion for summary judgment as to Mr. Smith's First Amendment retaliation claim will be denied.

### E.  Injunctive Relief

Before turning to Mr. Smith's injunctive relief claim, the Court will first clarify the scope of Mr. Smith's retaliation claim. As permitted by the IRO, Mr. Smith's retaliation claim is Captain Perez's alleged retaliation against him for the various complaints which Mr. Smith filed against Captain Perez, culminating in the December 11, 2018 Grievance. *See* IRO at 16 ("Mr. Smith has alleged that he filed an Inmate Request Form on December 4, 2018, complaining that

Captain Perez and Counselor Supervisor Long were discriminating against him by depriving of him of his housing and job assignments, and, then, Captain Perez and Counselor Supervisor Long retaliated against him by informing the other inmates that he was the reason for their change in housing and employment." (citing Compl. ¶¶ 27, 44)). Thus, the protected conducted here is the entirety of Mr. Smith's December 11, 2018 Grievance and the documentation in connection with that Grievance.

Turning to Mr. Smith's injunctive relief claim, in its initial Order, the Court noted that "that equitable relief, such as the injunctive relief Mr. Smith is requesting, is committed to the sound discretion of the district court." Initial MSJ Order at 11 (citations omitted). The Court explained that "at this juncture of the litigation, the Court need only decide whether Mr. Smith may request this injunctive relief remedy if a trier of fact finds that his First Amendment right has been violated." *Id.* The Court also noted that "there may be an issue as to whether Mr. Smith's requested relief is now moot" in light of possible changes as to where Mr. Smith is housed. *See id.* at 12 n.12.

Defendants argue that the Court should deny Mr. Smith's injunctive relief claim because, *inter alia*, that request is now moot as he is no longer detained at Osborn. *See* Renewed MSJ at 40 ("Here, the plaintiff's request for injunctive relief arises from his loss of his single cell housing and job at Osborn, however, the plaintiff is no longer housed at Osborn, as he is currently housed at the Cheshire Correctional Institution.") (footnote omitted).

In opposition, Mr. Smith asserts that it was not until after the Court issued its Ruling on Defendants' initial motion for summary judgment and about a month before Defendants filed their renewed motion for summary judgment that he was moved. *See* Renewed Opp'n at 20.

"The timing of [his] involuntary transfer," in the context of Defendants' mootness defense, he argues, "draws suspicion." *Id.*

Although "prisoners do not have a constitutional right to placement in a particular institution, . . . [t]he situation is different . . . when an inmate contends that the defendant prison officials transferred him as a way of retaliating against him for his exercise of a constitutional right." *Pelletier v. Armstrong*, No. CIV 399CV1559 HBF, 2007 WL 685181, at *12 (D. Conn. Mar. 2, 2007) (internal quotation marks omitted); *see also Roland v. Smith*, 907 F. Supp. 2d 385, 391 (S.D.N.Y. 2012) (explain that "an inmate cannot be transferred solely in retaliation for the exercise of his constitutional rights" (citing *Meriwether v. Coughlin*, 879 F.2d 1037, 1047 (2d Cir.1989)).

At this juncture, however, a claim of suspicious involuntary transfer is not properly before this Court. Mr. Smith's claim in this action is limited to Captain Perez's alleged retaliatory acts against him in connection with his December 2018 Grievance. Thus, because Mr. Smith is no longer housed at Osborn, his claim for injunctive relief with respect to his single cell status and job at Osborn is now moot, unless some other form of injunctive relief not dependent on his status at Osborn is sought. *See Baltas v. Chapdelaine*, No. 3:17-CV-242(RNC), 2022 WL 4599155, at *8 (D. Conn. Sept. 30, 2022) ("When an inmate is moved from the facility that is the site of his claim for injunctive relief, the request is generally moot.") (citing *Young v. Coughlin*, 866 F.2d 567, 568 n.1 (2d Cir. 1989)).[16]

Accordingly, the Court will grant Defendants' renewed motion for summary judgment on Mr. Smith's injunctive relief with respect to his single cell status and job at Osborn, but will be

---

[16] To be clear, nothing in this Order precludes Ms. Smith from pursuing recourse for his perceived "suspicious" transfer in the appropriate forum in another case.

denied without prejudice, to the extent Mr. Smith is claiming the availability of some other form of injunctive relief not related to his presence at Osborn.[17]

**CONCLUSION**

For the foregoing reasons, Defendants' renewed motion for summary judgment is **GRANTED** in part and **DENIED** in part.

Specifically, Defendants' renewed motion for summary judgment as to Mr. Smith's First Amendment Retaliation claim is **DENIED.**

Defendants' renewed motion for summary judgment as to Mr. Smith's request for injunctive relief with respect to his single cell status and job at Osborn, is **GRANTED** but will be **DENIED** without prejudice, to the extent Mr. Smith is claiming the availability of some other form of injunctive relief not dependent on his presence at Osborn.

SO ORDERED at Bridgeport, Connecticut, this 14th day of July, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[17] "[O]nce a right and a violation been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Ueno v. Napolitano*, No. 04 CV 1873 (SJ)VVP, 2007 WL 1395517, at *7 (E.D.N.Y. May 11, 2007) (quotation marks and citation omitted) (alteration removed)). Thus, although the Court has granted Defendants' motion for summary judgment on Mr. Smith's injunctive relief claim because that that specific claim is now moot in light of Mr. Smith's transfer, if a jury finds that Mr. Smith has proven his First Amendment retaliation claim against Captain Perez, the Court retains its inherent authority to fashion an equitable remedy beyond monetary remedies, if any, provided by the jury.